IN THE DISTRICT COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE

JIMMY LAMPLEY, )
)
    Plaintiff, )
)
vs. )
)
STATE OF ALASKA, )
)
    Defendant )   Case No.: 3AN-S00-13209 CI.
)   T/W    3AN-S98-00397 CR.

## SECOND AMENDED APPLICATION FOR POST CONVICTION RELIEF

> **VRA CERTIFICATION**
> I, David R. Weber, certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

COMES NOW Jimmy Lampley, by and through counsel, David R. Weber, of the firm of Vasquez & Weber, P.C., and enters this his Second Amended Application For Post Conviction Relief.

### I.    PROCEDURAL HISTORY AND FACTS

Mr. Lampley was charged in 1998 with violation of a Domestic Violence Retraining Order in violation of AS 11.56.740. There were thirteen (13) counts. Each count was based upon Mr. Lampley having written a letter, one for each count. No other act or violation was alleged as a basis for the charges.[1]

---

[1]    The State originally charged Mr. Lampley with having made telephone calls. Those charges were dropped by the State in favor of the charges based upon the letters.

VASQUEZ & WEBER, P.C.
943 WEST SIXTH AVE., SUITE 132
ANCHORAGE, ALASKA 99501
(907) 279-9122   FACSIMILE (907) 279-9123

In January of 1998 Mr. Lampley was in jail awaiting trial for having assaulted D.M. After several communications from the incarcerated Mr. Lampley, D.M. asked for and received an *ex-parte* Domestic Violence Restraining Order ("DV Order") on January 7, 1998. See, Mueller v. Lampley, 3AN-89-44 DV.[2] The twenty (20) day DV Order was followed up with a six (6) month order on January 26, 1998.

Mr. Lampley was incarcerated on both January 7 and 26, 1998. Mr. Lampley was not able or allowed to attend either of the hearings in Mueller v. Lampley, 3AN-89-44 DV. Mr. Lampley was not represented by counsel in Mueller v. Lampley, 3AN-89-44 DV. Mr. Lampley was not offered appointed counsel in Mueller v. Lampley, 3AN-89-44 DV.

The twenty (20) day DV Order was dated January 7, 1997. That date error and alleged deficiencies in service of the DV Orders underlay Mr. Lampley's defense at trial. In addition, Mr. Lampley defended on necessity grounds: that he was writing the letters to D.M. to try to avoid the significant evil of his being unjustly imprisoned for a December 2001 assault on D.M. The jury rejected Mr. Lampley's defenses and he was convicted on all thirteen (13) counts on October 21, 1998. Mr. Lampley was sentenced on February 5, 1999, and the judgments were distributed that day.

No constitutional defense based upon freedom of speech was raised at trial or by pretrial motion. This was an oversight, not a tactical choice. Please see, Exhibit 1, Affidavit of Jill E. Farrell. The failure to recognize and research the possibility of a constitutional defense based upon freedom of speech resulted in ineffective assistance of counsel. Please see, Exhibit 2, Affidavit of Susan C. Orlanski. As will be shown, the failure to follow through and present such defenses was ineffective as well. The resultant

---

[2] The Court may take judicial notice of its own files. In any event, Mr. Lampley incorporates that Court file herein by reference as if fully set forth at this point.

conviction is in derogation of the constitutions of the United States and the State of Alaska.

Thereafter, Mr. Lampley appealed. No constitutional claim based upon freedom of speech was raised in the appeal. This was an oversight, not a tactical choice. <u>Please see</u>, Exhibit 12, Affidavit of Michael Dieni. The conviction and sentences were affirmed on October 12, 2001. <u>Lampley v. State</u>, 33 P.3d 184 (Alaska App. 2001). Mr. Lampley pursued a Petition For Hearing before the Alaska Supreme Court. The Petition was denied.

Meanwhile, Mr. Lampley was having extensive difficulty with the Department of Corrections ("DOC") and many of its employees. These difficulties resulted in a number of disciplinary measures being taken against Mr. Lampley. Among other things, these disciplinary measures resulted in Mr. Lampley losing his "good time."[3]

After having taken all of Mr. Lampley's "good time" away,[4] and after having imposed more time in punitive segregation on Mr. Lampley than remained on his sentence, DOC was left with no "official" method of expressing its displeasure with Mr. Lampley.[5] Thereafter, Mr. Lampley was simply left on "Max-Max" status, a classification that kept his freedoms of movement and choice to an absolute minimum.

---

[3]  Mr. Lampley's "maximum release date" based on the underlying and several other cases was October 10, 2001. Less time off for "good time" his release date was July 6, 2000. Exhibit 3, DOC Time Accounting sheet

[4]  Initially, DOC took away more "good time" than Mr. Lampley had.

[5]  DOC has asserted that Mr. Lampley's last formal disciplinary action was on either January 18, 2001 or September 26, 2000, depending on which DOC employee is making the representation. <u>Please compare</u>, Exhibits 4 and 5, August 6, 2001 response to Mr. Lampley's Request For Interview and August 30, 2001 recommendation of Sgt. Clair Sullivan, respectively.

VASQUEZ & WEBER, P.C.
943 WEST SIXTH AVE., SUITE 132
ANCHORAGE, ALASKA 99501
(907) 279-9122   FACSIMILE (907) 279-9123

<u>Lampley v. State</u>, 3AN-01-13209 Ci.
Second Amended Application For Post Conviction Relief
Page 3 of 26
Exhibit L
Page 3 of 51

In addition, Mr. Lampley was subjected to "unofficial" punishment *via* an extended campaign of petty harassments.[6]

Whether as a result of harassment, Mr. Lampley's misbehavior, or both, a series of "Incident Reports" alleging inappropriate behavior on the part of Mr. Lampley resulted. However, because "Prisoner's punitive segregation sanctions exceed[ed] the length of his sentence" these allegation "Records [were] maintained for documentation" only.[7] That is, Mr. Lampley was not provided copies of these "documentation" incident reports.[8] Nor was Mr. Lampley afforded any opportunity to respond to the allegations contained in the "documentation" incident reports. Thus, there were no due process disciplinary hearings held for Mr. Lampley based upon the "documentation" incident reports.

On August 7, 2001 Mr. Lampley applied to have his "good time" restored pursuant to 22 AAC 05.472.[9] That section states:

---

[6] Mr. Lampley was allowed access to a typewriter for his legal pleadings: but no paper. Mr. Lampley was allowed the typewriter in the very early A.M.: in a cell where the light fixture was broken. Mr. Lampley was housed in a cell beneath that of an inmate who was in the habit of placing his wastes upon the floor, where it flowed down into Mr. Lampley's cell. Mr. Lampley had light and visual access to his cell blocked by a makeshift plywood wall that was pushed up against his cell window. Mr. Lampley was systematically denied food and beverage. Mr. Lampley was denied postage and postal supplies for his litigation materials until he had all his copies prepared: at the same time he was denied copy service until he has his postal supplies and postage lined up. Mr. Lampley had his legal materials both taken and placed in disarray by sudden and retaliatory searches of his cell. Mr. Lampley had is legal materials read by searching correctional officers and suffered retaliation for the information and charges he put in those pleadings. Retaliation often took the form of physical abuse.

[7] The quoted material comes from "Incident Reports" Mr. Lampley secured while defending State v. Lampley, 3AN-S01-8094 Cr.

[8] Mr. Lampley secured the reports while defending State v. Lampley, 3AN-S01-8094 Cr.

[9] Please see, Exhibits 6, 7, 8 and 9, August 7, 2001 "Request For Interview," August 20, 2001 "Request For Interview," August 27, 2001 Prisoner Grievance, September 1, 2001 Prisoner Grievance Appeal, respectively.

(a) Except as provided in 22 AAC 05.473, a prisoner found guilty of a disciplinary infraction who has had statutory good time forfeited may, at the discretion of the commissioner, have up to 100 percent of the forfeited good time restored in accordance with the criteria and procedures established by the commissioner in the department's Policy and Procedure # 809.07, dated May 14, 1992, hereby adopted by reference, if the prisoner has demonstrated satisfactory progress in faithfully observing the rules of the correctional facility in which the prisoner is housed.

(b) *In order to be eligible for restoration of good time under this section, prisoners must have served the applicable following period of good conduct* since the occurrence of the infraction:

  (1) 30 days for a low-moderate infraction, as described in 22 AAC 05.400;

  (2) 60 days for a high-moderate or major infraction, as described in 22 AAC 05.400.

(c) For purposes of this section, *"good conduct" means the absence of a violation of a disciplinary rule listed in 22 AAC 05.400 or approved by the commissioner under 22 AAC 05.300(g), other than a minor infraction, for which guilt has been established through the disciplinary process.*

[Emphasis supplied]. The request was denied.[10]

Mr. Lampley's *pro se* Application for Post Conviction Relief ("PCR") was filed on December 26, 2000. He was appointed counsel and the matter was held in abeyance pending resolution of the appeal. The Court ordered an amended application filed by counsel on pain of dismissal. The First Amended Application For Post Conviction Relief was filed on April 30, 2002. On October 28, 2002 the Court issued, at the State's suggestion, an Order permitting Mr. Lampley to file a Second Amended Application For Post Conviction Relief. This pleading follows.

## II. CLAIMS

**A. Constitutional Violations: Criminal Rule 35.1(a)(1)(6) and AS 12.72.010(1)(6).**

---

[10] Please see, Exhibits 7, 8 and 9, Undated response to August 20, 2001 "Request For Interview," August 30, 2001 response to August 27, 2001 Prisoner Grievance and September 18, 2001 Director of Institution's Decision, respectively.

Mr. Lampley's conviction was secured in violation of the constitutions of the United States and the State of Alaska. There are four grounds for this claim. First, writing letters is constitutional protected speech that cannot be forbidden, much less criminalized.

Second, as to Counts XII and XIII, the convictions are grounded upon an order and procedure that deprived Mr. Lampley of Due Process of Law. The State actively prevented Mr. Lampley from exercising his "opportunity to respond" to D.M.'s request for a six month DV Order, denied his right to be present, failed to afford him counsel and then prosecuted him for violating the DV Order secured as a result.

Third, Mr. Lampley was denied the assistance of counsel at trial. Ms. Farrell labored under conflicts of interest and as a result Mr. Lampley was unable to trust in, or effectively communicate with, his trial lawyer.

Fourth, Mr. Lampley was denied the assistance of counsel on appeal. The same conflicts of interest that hobbled Ms. Farrell applied to her Public Defender "law partner," Mr. Dieni.

### 1. **Freedom of Speech**

None of the legacies left to us is more precious than our ability to speak our minds. Even though a thought be odious we are entitled to air it. We cannot compel others to heed our speech, but they cannot force us to "Put a sock in it."

Except in Alaskan domestic violence cases.

Alaska has unwittingly crafted a vast exception to the norms of free speech. It has done so *sans* debate, analysis, or apparent conscious thought. Because eradicating domestic violence is good, anything offered to help in that effort is good, too. Gone is any analysis of "compelling state interest." Gone is any analysis of efficacy. Gone is any analysis of whether the prohibition has been narrowly tailored to achieve the compelling

state interest. Gone is even the merest pretext of a reasonable time, place or manner restriction. Instead, a "perpetrator" of domestic violence is told by judicial *fiat* that at no time, and in no place, and in no manner will he or she speak, on any subject, to a specified audience. Often, as here, the order is so broad as to include speech that cannot conceivably result in any further act of violence: writing letters.[11] Content isn't even at issue (except as to the identity of the intended audience): all content is forbidden. Finally, this prior restraint is most often issued *in absentia*.

Prior restraints of freedom of speech, where justified at all, are limited to reasonable time, place and manner restrictions. State v. Alaska Civil Liberties Union, 978 P.2d 597 (Alaska 1999). A statute regulating speech is overbroad, and thus unconstitutional, "when constitutionally protected conduct as well as conduct which the state can legitimately regulate are included within the ambit of [a] statute's prohibition." Marks v. City of Anchorage, 500 P.2d 644, 646 (Alaska 1972).

Assaultive speech is not the issue herein. Even if it were, the constitutional issue would remain. Thus, while that "there is no First Amendment right to threaten someone else with harm" [Baker v. State, 22 P.3d 493, 499 (Alaska App. 2001)] the right to speak freely does impact the proper application of criminal laws. For example, in Watts v. United States, 394 U.S. 705 (1969) a federal statute concerning threats to the President of the United States had to take on additional gloss to avoid running afoul of free speech. In Powell v. State, 12 P.3d 1187 (Alaska App. 2000) the letter of the assault statute had to take on additional gloss to avoid running afoul of free speech. In McKillop

---

[11] Taking out a newspaper add or flying a message behind a plane would have also run afoul of the DV Order in question. Indeed, though the Trial Courts look away when it is pointed out ("We didn't mean that!") the DV Order in question (as with most of them) forbid a Respondent's attorney from contacting the Petitioner ("indirect contact").

VASQUEZ & WEBER, P.C.
943 WEST SIXTH AVE., SUITE 132
ANCHORAGE, ALASKA 99501
(907) 279-9122   FACSIMILE (907) 279-9123

v. State, 857 P.2d 358 (Alaska App. 1993) the harassment statute had to take on additional gloss to avoid running afoul of free speech.

The speech at issue in Watts, Powell, McKillop and here may have been odious. As with most controversial speech, one need not agree with the messenger it to recognize that he/she carries a message. It is precisely with cases of odious messages and their messengers that we must be most diligent in protecting freedom of speech. See generally, National Socialist Party v. Skokie, 432 U.S. 43 (1977) [*injunction* forbidding Nazis to march through community that included holocaust survivors overturned]; Smith v. Collin, 439 U.S. 916 (1978) [legislative actions to prevent Nazis' operations in Skokie overturned by 7th Cir., Supreme Court declined to review]. Protection of popular, "pretty" speech is no protection at all: It needs none.

This is not a frivolous claim or issue. The Court of Appeals has recognized that the Legislature has come perilously close to chilling protected speech in enacting the Stalking statutes. Petersen v. State, 930 P.2d 414 (Alaska App.1996).

> The constitutional arguments raised by the defendants are not trivial. As we noted at the beginning of this section, the stalking statutes' definition of "nonconsensual contact" covers a wide spectrum of social interaction. This definition is undoubtedly the Alaska Legislature's most comprehensive codification of a person's right to be free from unwanted contact. Yet even though our society values and protects individual autonomy and privacy, our society at the same time recognizes a person's right to engage in uncomfortable, distasteful, and annoying contacts - even abrasive confrontations - with other citizens. Such interactions are not merely tolerated; they are explicitly protected by our Constitution.

Petersen v. State, 930 P.2d at 431. Alaska's Trial Courts must begin to recognize in their own conduct what they can readily see in an act of the Legislature.

Characterizing the issue as punishing the violation of a DV Order, not punishing the manner of the violation, only avoids the simple truth of the matter that Alaska routinely forbids, and then jails, people like Mr. Lampley for speaking. Indigents, and

most ordinary citizens, lack the financial resources to show up for, much less appeal the constitutionality of an underlying DV Order. The ACLU does not rush to the defense of "perpetrators of domestic violence" and their right to speak. The Public Defender can only do so in a collateral criminal action (and here failed in that opportunity).[12]

The commands from the judiciary are not immune from free speech scrutiny. They face no lesser analytical hurdle when restricting freedom of speech. Many of the ***seminal freedom of speech cases are directed at judicial orders***. New York Times Co. v. United States, 403 U.S. 713 (1971); National Socialist Party v. Skokie, supra; Vance v. Universal Amusement Co., 445 U.S. 308 (1980); Madsen v. Women's Health Center, Inc., 512 U.S. 753, (U.S. 1994).

Madsen holds that the traditional time, place and manner analysis ***is insufficient*** in addressing a judicial injunction. The Court noted that injunctions carried "***greater risks of censorship and discriminatory application*** than do general ordinances" and that "these differences require a somewhat ***more stringent application*** of general First Amendment principles in this context." Therefore the Court "must ask instead whether the challenged provisions of the injunction ***burden no more speech than necessary to serve a significant government interest***." Madsen, 512 U.S. at 764 – 765 [emphasis supplied]; citing Califano v. Yamasaki, 442 U.S. 682, 702 (1979) and Railway Express Agency, Inc. v. New York, 336 U.S. 106, 112 - 113 (1949) ("[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.") In evaluating a content-neutral injunction, the governing standard is whether

---

[12] By observing that such is the current state of affairs Mr. Lampley does not abandon his claim that counsel should be appointed for indigents in Domestic Violence Restraining Order cases. That argument is set forth below.

the challenged provision burdens no more speech than necessary to serve a significant government interest. Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 184 (1968). The order must be couched in the narrowest terms that will accomplish its pinpointed objective. Id., at 183.

For the purposes of this argument Mr. Lampley will concede that the State has a legitimate, compelling interest in protecting its citizens from acts of violence.[13] What is not conceded is that the routine daily admonition from the Trial Courts to all Respondents (including Mr. Lampley) to have "no contact, direct or indirect," makes even a token effort at complying with Madsen to "burden no more speech than necessary." Handbills, messages towed by planes, skywriting, telephone calls, newspaper advertisements and letters are not acts of violence.[14] No one can be forced to look up at the plane. No one can be forced to search the newspaper for obscure missives. The telephone can be hung up, left in its cradle or unplugged. Letters can be tossed, burnt or put down at any time. Why any burden on "distance speech" is necessary is far from apparent. Making an outright prohibition on such speech the norm is patently unconstitutional.

Politically correct observations about how bad and controlling perpetrators of domestic violence are do not advance the inquiry. Nazis were and are obnoxious, too.

---

[13] Mr. Lampley does not use the term "domestic violence" because that term is overbroad as defined in Alaska. AS 16.66.990. Simple, non-threatening speech can be a "crime involving domestic violence" as defined in Alaska law.

[14] Counsel is aware that there is a body of social thought that considers all words from a perpetrator of domestic violence to a victim of domestic violence just one more form of domestic violence. With all due respect, that analysis cheapens the horror of broken bone and spilt blood. It is also in keeping with hoary thought that to speak against the King is to commit treason and is therefore good and sufficient reason for beheading. The Courts have routinely noted that speech is often unpleasant. Further, if the speech of Nazis, in physical proximity to the victims of the Holocaust is insufficiently "violent" to warrant the suppression of their speech, the speech of a perpetrator, not in physical proximity, to the victim of a less historic outrage cannot be more so.

Anyone can think of dozens of obnoxious, controlling people that he/she would like to never again have to hear, get letters or telephone calls from, much less see. The desire to be shed of such folk (even in the privacy of the home) is insufficient justification for silencing them.

Further, while the State's interest in protecting its citizens from violence and threats of violence can be characterized as "compelling," the State's interest in precluding all "controlling behavior" cannot.[15] That domestic violence is sometimes fatal simply drags a red herring across the path to the issue at hand: regulating speech.[16] Society's very real domestic violence problem is not rooted in the triviality of being annoyed by whinny, self-pitying letters.

It is fallacious to argue that the Courts issuing the original DV Orders gauge the circumstances of the domestic violence and determine the scope of the speech to forbid. A visit to a typical day at DV Court reveals that the Rules of Evidence and Civil Procedure are used sparingly. Litigants have their cases cut short. Attempts at formality

---

[15] The Court's October 28, 2002 Orders were, by definition, controlling, manipulative and discriminatory. That makes them neither wrong nor abusive. It is the Court's function to make choices and govern the cases before it. Charging the words "controlling" and "manipulative" with emotion divorced from meaning is not helpful.

[16] Resort to such red herrings is common in addressing domestic violence issues. A record supporting the relevance of such red herrings to the facts of a particular case at hand appears rare. Of the thousands of domestic violence restraining orders issued in Anchorage (or Alaska), how many were violated in a manner that caused a death? Assuming there were a few, what was the percentage? (Less than 1/10th % would be Counsel's wager.) And actual violence? (Less than 10% would be Counsel's wager.) How many of those deaths or acts of violence were precipitated by telephonic or written speech? The freedom of speech of the vast majority of the "respondent" class is being restrained based on the bad behavior of a small minority. Worse, the entire "respondent" class is having their speech curtailed even though there is nothing to suggest that the breadth of the restrictions on speech have any effect on the level of violence by that small minority. It is precisely this error in analysis that underlies State v. Hauge, 547 N.W.2d 173 (S.D. 1996) and State v. Hardy, 2002 WL 1577097 (Utah App 2002).

are often viewed with hostility. A record substantiating a narrowly tailored, efficacious remedy to address compelling need to issue a prior restraint on all speech is **_never_** developed.

A similar overbroad injunction was approved in a South Dakota case, State v. Hauge, 547 N.W.2d 173 (S.D. 1996). A review of Hauge reveals that the South Dakota Court engaged in a minimal free speech "analysis," and one that is at odds with controlling Federal precedent and precedent that certainly would control in Alaska. The South Dakota Court was conclusary:

> Certainly the State has a legitimate interest in providing its citizenry with protection from perverse telephone calls. With the passage of SDCL 49-31-31(1), our Legislature intended to ban the type of unreasonable conduct which, by its very nature, erodes the peace of mind and solitude of an unsuspecting individual. *Conduct of this nature is obviously not protected by the guarantees of free speech provided for in the First Amendment.*

State v. Hauge, 547 N.W.2d at 175 [emphasis supplied]. The "perverse telephone calls" the South Dakota opinion found to be "obviously not protected" **_is protected under Alaska law_**. McKillop v. State, 857 P.2d 358 (Alaska App. 1993). Nor does Hauge attempt to square protecting the well being, tranquility, and privacy of the home from the US Mail with binding precedent allowing Nazis to march outside the windows of that very same home.[17] An "unsuspecting" individual's desire for "peace of mind and solitude" does not trump freedom of speech: very little does.

---

[17] The South Dakota Court also included politically correct comments about the mental and emotional health of the vulnerable overriding "less compelling interests" e.g. freedom of speech. That position deserves very critical thought. Besides claims of mental and emotional distress not being supported by that record or this (much less such any distress being caused by mere speech), the underlying proposition is that speech may be curtailed because the listener is fragile. There is no principled way to limit that incorrect statement of basic first amendment jurisprudence to domestic violence cases. Rather than reform current practice to established constitutional norms, domestic violence advocates are militating for even greater prior restraints on speech. See, Kohn, L. Why Doesn't She Leave? The

VASQUEZ & WEBER, P.C.
943 WEST SIXTH AVE., SUITE 132
ANCHORAGE, ALASKA 99501
(907) 279-9122    FACSIMILE (907) 279-9123

That last statement remains true even in the face of any "privacy" argument, including citation to <u>Siggelkow v. State</u>, 731 P.2d 57 (Alaska 1987). While <u>Siggelkow</u> did involve a prior restraint upon freedom of speech, the issue in the case was the jurisdiction of the Superior Court, not the constitutionality of the restraint on speech. The Supreme Court made it very clear that it was not passing on the propriety of the scope of the underlying order:

> The circumstances which led to the issuance of the no-contact order in this case are not in the record on appeal, and Walter does not contend that they are insufficient to justify the challenged remedy. Rather, Walter contests generally the authority of the court to issue a no-contact order. The question thus before us is whether, under any circumstances, a court is justified in enjoining contact with a former spouse.

<u>Siggelkow v. State</u>, 731 P.2d at 61. Mr. Lampley is raising a freedom of speech issue. That issue was not raised in <u>Siggelkow</u>. Further, a review of <u>Siggelkow</u> and the cases it cites reveal that the conduct then at hand, and the invasions of privacy then at issue, to be far more severe than mere speech, much less speech in the form of the US Mail.

Any "privacy" justification advanced for Mr. Lampley's conviction rests on an unstated assumption that we speak by sufferance, not right. Hence, whenever DM "withdrew her consent" to being contacted the Court could forbid speech. However, that claim and any claim that the First Amendment "does not protect speech which barges into the sanctuary of others against their wishes," flies in the face of established case law.

> Yet even though our society values and protects individual autonomy and privacy, our society at the same time recognizes a person's right to engage in uncomfortable, distasteful, and annoying contacts - even abrasive confrontations - with other citizens. Such interactions are not merely tolerated; they are explicitly protected by our Constitution.

---

<u>Collision Of First Amendment Rights And Effective Court Remedies For Victims Of Domestic Violence</u>, 29 Hastings Const. L.Q. 1 (2001) [advocating additional prior restraints on freedom of speech to preclude respondents from saying bad things about petitioners].

VASQUEZ & WEBER, P.C.
943 WEST SIXTH AVE, SUITE 132
ANCHORAGE, ALASKA 99501
(907) 279-9122   FACSIMILE (907) 279-9123

Petersen v. State, 930 P.2d 414 at 431 (Alaska App. 1996). See also, McKillop v. State, 857 P.2d 358 (Alaska App. 1993).

The right of privacy, and the legislative and judicial "obligation"/jurisdiction to enforce it, are not contingent upon a finding of domestic violence.[18] That is, everyone in Alaska has the same right of privacy, abused or no. Some intrusions into our privacy are a price we pay for taking up space, breathing and being free. It was not an intrusion into privacy that formed the "compelling state interest" underlying the DV Orders at issue: preventing violence, not protecting privacy was the "compelling state interest." Thus the "privacy" argument presupposes a universal interest to protect and the consequent right to Orders precluding any object of our displeasure to stop sending us mail. Such is obviously not the law.

2. **Due Process**

A fundamental tenant of Due Process of Law is an opportunity to respond. Aguchak v. Montgomery Ward Co., 520 P.2d 1352 (Alaska 1974). Here Mr. Lampley has denied that he was given notice of either the first or second DV Order. Even if the Court does not agree, it is undeniable that Mr. Lampley was not in attendance at either hearing. He was jailed by the State of Alaska at the time. He was not allowed to attend by person or by telephone. Nor was he afforded or offered the assistance of counsel.

---

[18] The lack of other justices adopting Justice Burkes concurring reliance on Art. 1 sec. 22 of the Alaska Constitution in Siggelkow is probably due to the generally accepted view that Article 1 of the Constitution deals with the government's relationship to the citizenry as opposed to the citizenry's interrelationships with one another. Any claim that the Domestic Violence Statutes are thus "required" is thus a novel and unsupported. There are any number of ways the Legislature could decide to help secure Alaskans in their privacy *vis a vis* their government and each other. It does not follow, however, that the Legislature is "required" to take any affirmative action to secure a particular privacy interest.